# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| CYNTHIA BOLLMEYER, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 10-3266-CV-NKL |
| MICHAEL ASTRUE, Commissioner of Social Security, | ) |
| Defendant. | ) |

## ORDER

Before the Court is Plaintiff Cynthia Bollmeyer's Social Security Complaint [Doc. # 1] brought under 42 U.S.C. § 405(g) to review a decision of the Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits and supplemental security income. For the following reasons, the Court affirms in part and reverses in part the Commissioner's decision and remands the case for further consideration.

**I.    Background[1]**

In her application for disability insurance benefits, Plaintiff Bollmeyer claimed that she became disabled on August 1, 2005, at age 47. Plaintiff has alleged an inability to work due to Post Traumatic Stress Disorder ("PTSD"), fibromyalgia, back injury, degenerative disc disease, and depression.

**A.    Medical Evidence**

---

[1] The facts and arguments presented in the parties' briefs are duplicated here only to the extent necessary. Portions of the parties' briefs are adopted without quotation designated.

Plaintiff Bollmeyer was treated for fibromyalgia by Anne E. Winkler, M.D., Ph.D., beginning as early as 2003. In January 2004, Plaintiff underwent surgery and developed complications requiring extended hospitalization. Plaintiff was off work until April 2004, when she returned to her 9-1-1 dispatcher job. That month, Plaintiff told her therapist that she had recently received two calls about rapes that triggered nightmares and anxiety related to her own rape in 1977 while she was in the military. In therapy sessions between April and August 2004, Plaintiff reported that she was having trouble sleeping and nightmares related to her rape and was uncertain whether she could continue to work with victims. In October 2004, Plaintiff reported that she had taken another rape call and was not able to sleep, eat, or function. Plaintiff's mental status examinations indicated racing thoughts and ruminations, and a sad mood.

On August 2, 2005, Dr. Winkler examined Plaintiff Bollmeyer, finding that she had trigger points but no synovitis. Dr. Winkler ordered neuropsychological testing to investigate Plaintiff's memory and concentration problems. She also ordered an MRI of Plaintiff's lumbar and cervical spine and electromyography based on Plaintiff's complaints of neck and back pain. Dr. Winkler noted that, at Plaintiff's request, she put her off work for a few weeks to do the testing. The MRI indicated mild degenerative disc disease of the cervical spine.

The next day, August 3, 2005, Plaintiff Bollmeyer saw Regina J. Walker, PMHNP, ANP, reporting anxiety and depression at a five on a scale of one to ten. Plaintiff's symptoms were improved since her last visit, but she stated that her supervisor had since told her that she was having memory problems at work. She reported being on leave so that she

would have time for medical evaluations and reported sleeping well. A mental status examination indicated increased ruminations and tearfulness when Plaintiff discussed her problems at work. That same day, Dr. Elizabeth Dean noted that Plaintiff had been diagnosed with fibromyalgia by Dr. Winkler.

Dr. Winkler referred Plaintiff Bollmeyer to Michael Whetstone, Ph.D., who completed a neuropsychological assessment after evaluating Plaintiff on August 29 and September 1, 2005. Dr. Whetstone noted that Plaintiff was adequately oriented and scored low average to superior on attention tests, but demonstrated remarkably incorrect and atypically fast responses to a test of sustained attention and concentration. Plaintiff's memory and intellectual functioning were average. Dr. Whetstone diagnosed depressive disorder with anxiety and likely somatoform components. On September 19, 2005, he opined on a Missouri Local Government Employees Retirement System ("LAGERS") form that Plaintiff had PTSD triggered by her job as a 9-1-1 dispatcher and was "unable to continue in her specific job." [Tr. 331.]

On October 3, 2005, Plaintiff Bollmeyer requested a letter from her therapist, Ms. Walker, stating that she could no longer work as an emergency dispatcher. Walker stated that they could discuss the letter at the next session. Plaintiff reported that medications helped her anxiety. A mental status examination was normal, though Plaintiff appeared anxious.

On October 21, 2005, Plaintiff Bollmeyer saw Dr. Dean for back pain. She reported that she needed notes from her doctors about her disability, and was "looking into

alternatives [to her 9-1-1 job] that she could deal with psychologically and physically." [Tr. 421.] That same day, Plaintiff stated in therapy that she hoped that her early retirement would enable her to find something to do that she would enjoy. A mental status examination indicated a sad mood, tearful affect, and increased ruminations.

On November 30, 2005, Plaintiff Bollmeyer saw Dr. Winkler for fibromyalgia follow up. Dr. Winkler noted that Plaintiff was being treated by a psychiatrist and counselor for PTSD and found counseling helpful. Dr. Winkler, in a letter to LAGERS dated December 20, 2005, opined that Plaintiff could no longer work as a 9-1-1 dispatcher due "in large part to her post traumatic stress disorder although that is also complicated by . . . fibromyalgia." [Tr. 445.]

Ms. Walker saw Plaintiff Bollmeyer on January 5, 2006. Plaintiff's mood was at a three or four out of ten, she was sleeping well, and having fewer nightmares. She was driving once or twice a week for the Disabled American Veterans ("DAV"), volunteering as a service officer with the American Legion, and walking daily for exercise. In therapy on March 9, 2006, Plaintiff reported considering part time work or school. On May 8, 2006, Plaintiff reported continued extensive volunteer activities with the DAV and Veterans of Foreign Wars ("VFW"). Mental status examinations still indicated a sad mood, tearfulness, and ruminations.

On May 31, 2006, Plaintiff Bollmeyer saw Dr. Winkler for fibromyalgia follow up. Her symptoms were stable. She was sleeping okay and trying to walk a mile daily.

4

In therapy with Ms. Walker on June 14, 2006, Plaintiff Bollmeyer reported that her finances were not a big worry, as she was medically retired, had filed for Social Security disability benefits, and was seeking an increase in her military disability. Her partner was also retired and on disability benefits. Plaintiff reported numerous volunteer activities with the DAV and significant travel with her partner. She planned to take a college course in the fall. Plaintiff reported that her concentration was down. A mental status examination was normal except for more ruminations.

In therapy on August 16, 2006, Plaintiff Bollmeyer reported that she and her partner had decided to separate and sell their house. Plaintiff reported depression at a nine out of ten directly tied to her relationship. She was driving for the DAV two days per week, working as a DAV service officer, and training at the Department of Veterans Affairs ("VA"). Ms. Walker noted a sad mood and tearfulness, as well as ruminations.

On August 21, 2006, Plaintiff Bollmeyer began treatment with Diana L. Collings, LCSW, after Ms. Walker relocated. Ms. Collings noted that Plaintiff reported memory problems, trouble sleeping, and panic attacks.

On September 21, 2006, Joekie Brouwer, M.D., noted that Plaintiff Bollmeyer retired from her dispatcher position "due to her own PTSD [symptoms] being triggered by her work." [Tr. 455.] Plaintiff was volunteering two days a week with the DAV. In October 2006, Dr. Brouwer noted that Plaintiff was feeling better, with improved sleep, energy, and brighter spirits. Plaintiff was pleased with her current medication and reported no side effects.

5

In therapy sessions with Ms. Collings in November and December 2006, Plaintiff Bollmeyer was logical, goal-directed, and cooperative. She planned to visit friends in Washington, D.C. On December 19, 2006, Plaintiff reported doing better.

Plaintiff's partner died December 23, 2006. Plaintiff was grieving and reported nightmares. She began taking a sleep aid. In January 2007, Plaintiff noted improved sleep, but greatly increased PTSD symptoms. She traveled with a friend to Los Angeles two weeks later. In February 2007, Plaintiff was planning a reunion of friends in her home, a trip to Canada, and considering taking college courses. However, she also reported difficulty sleeping and being at home alone.

Dr. Brouwer saw Plaintiff Bollmeyer on April 3, 2007 and noted that she was grieving the death of her partner. That same day, Ms. Collings noted that Plaintiff had recently taken a weekend trip with a friend and was remodeling her house. Plaintiff reported improved sleep and depression symptoms. By May 2007, she was coping better.

On June 19, 2007, Dr. Winkler noted that Plaintiff Bollmeyer's fibromyalgia was complicated by PTSD and she was coping with stress and grieving. Dr. Winkler prescribed fibromyalgia medication. Plaintiff reported an upcoming road trip with friends on June 26, 2007. She was having trouble sleeping.

On July 17, 2007, Plaintiff Bollmeyer stated that her dogs had recently died. She was organizing a support group for female veterans. Ms. Collings noted on August 15, 2007 that Plaintiff was sad, but her mental status examination was otherwise normal. Plaintiff was looking forward to an upcoming trip, doing cross-stitch projects, and volunteering more.

6

On August 22, 2007, Plaintiff Bollmeyer reported continued fear at home, and Dr. Brouwer noted that they may need to consider inpatient treatment. A mental status examination indicated a depressed and tearful mood. Dr. Brouwer encouraged Plaintiff to take a cooking or aerobics class. On September 19, 2007, Ms. Collings noted that Plaintiff brought forms for disability continuance to their therapy session. Ms. Collings referred Plaintiff for inpatient PTSD treatment due to her continued losses. Plaintiff told Ms. Collings on September 26, 2007 that she had decided not to pursue inpatient PTSD treatment. On October 2, 2007, Dr. Brouwer noted that Plaintiff had not been taking her psychiatric medication. On October 8, 2007, Plaintiff saw Dr. Winkler, reporting increased pain in the past month, trouble sleeping, and continued depression related, in part, to the death of her partner.

On October 23, 2007, Dr. Winkler completed a physical medical source statement opining that Plaintiff could lift and carry 10 pounds frequently and 15 pounds occasionally, stand or walk continuously for one hour, stand or walk for four hours in an eight-hour day, sit continuously for two hours, sit six hours in an eight-hour workday, and occasionally push and pull. Dr. Winkler stated that Plaintiff could occasionally climb, stoop, kneel, crouch, and crawl, and frequently balance, reach, handle, finger, feel, see, speak, and hear. She noted that Plaintiff should avoid any exposure to extreme cold or heat, weather, wetness, humidity, and heights. Plaintiff did not need to lie down to alleviate pain and she had no limitations as a result of pain, medication, or medication side effects. Dr. Winkler opined that Plaintiff's limitations were due to PTSD and other psychological disorders.

Dr. Brouwer completed a mental medical source statement October 24, 2007, opining that Plaintiff was moderately limited in the ability to understand short and simple instructions, and markedly limited in the ability to remember locations and work-like procedures, and to understand and remember detailed instructions. She opined that Plaintiff had no significant limitations in her ability to carry out very short and simple instructions and sustain an ordinary routine without special supervision. However, she was moderately limited in the ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, work in coordination with or proximity to others without distraction, and make simple work related decisions. Dr. Brouwer opined that Plaintiff was markedly limited in her ability to carry out detailed instructions and maintain attention and concentration for extended periods, and extremely limited in her ability to complete a normal workday and workweek without interruption from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Brouwer stated that Plaintiff was moderately limited in the ability to accept instructions and respond appropriately to criticism from supervisors, significantly limited in her ability to be aware of normal hazards, take appropriate precautions, set realistic goals, or make plans independently of others. Dr. Brouwer opined that Plaintiff was markedly limited in the ability to respond appropriately to changes in the work setting and travel in unfamiliar places or use public transportation.

Dr. Dean opined in a physical medical source statement on October 24, 2007 that Plaintiff could lift and carry 10 pounds frequently and 10 pounds occasionally, stand or walk

continuously for 30 minutes and up to two hours in an eight-hour day, sit continuously for 30 minutes and up to five hours in an eight-hour workday, and was limited in her ability to push and pull. Dr. Dean opined that Plaintiff could occasionally balance, reach, handle, finger, and hear; frequently climb, stoop, kneel, crouch, crawl, and speak; but could never feel or see without glasses. Plaintiff should avoid any exposure to extreme cold, wetness, humidity, dust, fumes, hazards, and heights, and avoid moderate exposure to extreme heat, weather, and vibration. She opined that Plaintiff would need to lie down once or twice for 20 to 30 minutes during a workday. Dr. Dean stated that Plaintiff was too sleepy to drive because of her medications.

### B. Hearing before the ALJ

Plaintiff Bollmeyer testified at the administrative hearing that she was 5 feet 4 inches tall and weighed 175 pounds, but had gained about 15 pounds in 5 months due to stress. She stated that she had worked in record-keeping and data entry for the police department, taking police reports and entering them in a computer database, and then transferred to a 9-1-1 dispatcher position.

Plaintiff Bollmeyer testified that she became disabled on August 1, 2005, when she answered a 9-1-1 call related to a rape that brought back memories of her own rape in 1977. She testified that after receiving that call she "just couldn't do 9-1-1 anymore." [Tr. 519.]

Plaintiff stated that she lived alone in a three bedroom house and managed housework, yard work, and shopping without help. She testified that her PTSD had recently been

worsened by the loss of her partner, her boss, and a couple of pets. She testified that her new guard dog helped with her fear.

Plaintiff testified that she drove two to three times a week and that she volunteered with the DAV once or twice a week, driving a van with up to eight veterans 50 miles round trip to medical appointments. She testified that she got lost several times while driving and was unable to drive back to the DAV on a couple of occasions.

Plaintiff testified that she had pain between her shoulder blades, had a "lower level of COPD" and a soft tissue back injury from 1999, and had to shift position often to get comfortable due to fibromyalgia. [Tr. 539.] She testified that she had panic attacks or flashbacks at least 10 or 15 times weekly and crying episodes four days a week.

Plaintiff also testified that she could sit one and one half hours, four to five hours a day, provided she could shift position. She testified that she could stand two or three hours on average without a break. She explained that she would lie down to stretch during regular breaks while working as a dispatcher, but now needed to lie down for 35 minutes to 1 hour to stretch. She also testified that she could lift up to 15 pounds occasionally.

Vocational expert Terri Crawford testified at the hearing that Plaintiff's past jobs as a dispatcher and data entry clerk were sedentary and semi-skilled, and that both had transferable skills. The vocational expert testified that an individual of Plaintiff's age, education, and work history with the mental limitations in Plaintiff's residual functional capacity ("RFC") could perform work as a data entry clerk.

    **C.**    **The ALJ's Decision**

The Administrative Law Judge ("ALJ") denied Bollmeyer's Social Security claim at step four of the evaluation process. The ALJ found that while Bollmeyer had not engaged in substantial gainful activity since the alleged onset date of August 1, 2005, and did suffer from severe impairments of fibromyalgia, back pain, PTSD, and depression, she did not meet or equal a listed impairment. The ALJ then detailed Plaintiff's daily activities and travel, finding that: "Despite the allegations of disabling symptoms of panic attacks and posttraumatic stress disorder, the record shows the claimant has a very active lifestyle." [Tr. 23.] The ALJ relied heavily on the medical opinions of Dr. Winkler and State agency consultative psychologist Kenneth Bowles, Ph.D., rather than those of Dr. Dean and Dr. Brouwer. The ALJ concluded that Bollmeyer could return to her past relevant work as a data entry clerk, even if she could not return to the particular high-stress job of a 9-1-1 dispatcher.

## II.     Discussion

### A.     Standard of Review

In reviewing the Commissioner's denial of benefits, the Court considers whether the ALJ's decision is supported by substantial evidence on the record as a whole. *See Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). "Substantial evidence is evidence that a reasonable mind would find adequate to support the ALJ's conclusion." *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007) (citation omitted). The Court will uphold the denial of benefits so long as the ALJ's decision falls within the available "zone of choice." *See Casey v. Astrue*, 503 F.3d 687, 691 (8th Cir. 2007). "An ALJ's decision is not outside the 'zone of

choice' simply because [the Court] might have reached a different conclusion had [it] been the initial finder of fact." *Id.* (quoting *Nicola*, 480 F.3d at 886).

B. **Plaintiff's Arguments**

On this appeal from the ALJ's decision, Plaintiff Bollmeyer argues that the ALJ (1) failed to make a proper credibility findings, (2) accorded inadequate weight to the opinion of the treating physician, and (3) failed to provide a proper RFC.

1. **The ALJ's Credibility Finding**

The ALJ found that Plaintiff's subjective complaints were exaggerated and inconsistent with the other evidence and were not a sound basis for decision making. The ALJ's credibility finding is supported by substantial evidence on the record.

Credibility questions concerning a claimant's subjective testimony are "primarily for the ALJ to decide, not the courts." *Baldwin v. Barnhart*, 349 F.3d 549, 558 (8th Cir. 2003) (citing *Benskin v. Bowen*, 830 F.2d 878, 882 (8th Cir. 1987)); *see also Eichelberger v. Barnhart*, 390 F.3d 584, 590 ("We will not substitute our opinion for that of the ALJ, who is in a better position to assess credibility."). To analyze a claimant's subjective complaints, the ALJ considers the entire record including the medical records, third party and Plaintiff's statements, and such factors as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of pain or other symptoms; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). An ALJ is not required to discuss methodically each *Polaski* factor, so long as he "acknowledged and considered those factors

12

before discounting [the claimant's] subjective complaints." *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006) (quoting *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)).

Here, the ALJ referenced the *Polaski* factors from 20 C.F.R. § 404.1529 and SSR 96-7p, and then referred to various factors in discounting Plaintiff's subjective complaints. The ALJ noted that Plaintiff Bollmeyer traces her PTSD to an incident that occurred in 1977. She reported answering rape calls in September 2003, April 2004, and October 2004, but was able to continue working until taking another rape call in August 2005 while working as a 9-1-1 dispatcher.

The ALJ also wrote:

> The claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. It is noted that the claimant lives alone and has not reported any particular help in maintaining the residence. Despite the allegations of disabling symptoms of panic attacks and posttraumatic stress disorder, the record shows the claimant has a very active lifestyle. Progress reports from the Veterans Administration show that she began treatment for her mental impairments in August 2005. By January 2006, she said she was driving for the DAV 1-2 days a week as well as volunteering at the American Legion. She also said she was exercising and walking every day. Further, those records show that the claimant traveled to Los Angeles with a friend in January 2007, despite the recent loss of her partner. At the next follow up visit in February 2007, she said she was considering taking classes at a community college and planning to visit friends and take another trip. Further, she was planning to host a 20 year reunion with friends at her home. In April 2007, the claimant reported she took a weekend trip with a friend and was working on remodeling her house. In August 2007, the claimant said she was putting in more time with the DAV as a driver as well as doing some writing for their newsletter. She also said she was continuing to work on cross stitch projects. Overall, the progress notes from the claimant's therapist show the claimant remained very active in 2007. She was planning several trips, including driving to Washington D.C. in September 2007. Although vacations and a disability are not necessarily mutually exclusive, the claimant's decision to go on [ ] several

13

trips tends to suggest that the alleged symptoms and limitations may have been overstated.

[Tr. 23.] This is not boilerplate language as Plaintiff suggests, but rather an individualized inquiry into Plaintiff's credibility. Plaintiff does not attempt to contradict the record regarding these varied activities that she has undertaken since she quit her job as a 9-1-1 dispatcher. "[A]cts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." *Halverson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010) (quoting *Heino v. Astrue*, 578 F.3d 873, 881 (8th Cir. 2009)).

Although Plaintiff Bollmeyer received VA disability benefits, the VA disability criteria differ from those of the SSA, and a finding of disability by the VA is non-binding on the SSA or the ALJ. *Pelkey v. Barnhart*, 433 F.3d 575, 579 (8th Cir. 2006). The ALJ noted that Plaintiff's VA disability benefits constituted a financial incentive for Plaintiff not to return to work. The ALJ found that Plaintiff's steady work history prior to her alleged onset date of disability was a neutral factor in assessing her credibility.

In sum, the ALJ articulated the inconsistencies upon which he relied in discrediting Plaintiff's allegations regarding the extent of her limitations. For the reasons stated above, this finding is supported by substantial evidence in the record as a whole.

### 2. Whether the ALJ Improperly Disregarded Medical Opinions of Treating Sources

Plaintiff Bollmeyer also argues that the ALJ erred in assigning weight to the medical opinions of record. The ALJ relied on the opinions of treating physician Dr. Winkler and

State agency consultative psychologist Dr. Bowles in determining Plaintiff's RFC. The ALJ afforded less weight to the opinions of Dr. Brouwer and Dr. Dean because he concluded that they relied heavily on Plaintiff's subjective reports of her symptoms and limitations.

While a treating physician's opinion is generally entitled to controlling weight, such is the case where "it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." *Medhaug v. Astrue*, 578 F.3d 805, 815 (8th Cir. 2009) (quoting *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005)). A treating physician's opinion "does not automatically control in the face of other credible evidence on the record that detracts from that opinion." *Brown v. Astrue*, 611 F.3d 941, 951 (8th Cir. 2010) (quoting *Heino v. Astrue*, 578 F.3d 873, 880 (8th Cir. 2009)). "'An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" *Id.* (quoting *Goff*, 421 F.3d at 790).

However, under 20 C.F.R. § 404.1527(d), when the ALJ does not give the treating source's opinion controlling weight, he considers the following factors in determining the weight to give the opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) "supportability" – i.e., the evidence a medical source presents to support an opinion – (4) the consistency of an opinion with the record as a whole, and (5) specialization. If an ALJ discounts a treating

physician's opinion, he must give "good reasons" for doing so. *Dolph v. Barnhart*, 308 F.3d 876, 878 (8th Cir. 2002).

Here, the ALJ discounted the opinions of two treating physicians in a single paragraph:

> Less weight is given to the Medical Source Statements from Dr. Broewer and Elizabeth Dean, D.O. (Exhibits 12F, 13F). These doctors apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported. Yet, as explained elsewhere in this decision, there exist good reasons for questioning the reliability of the claimant's subjective complaints. The possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patient's [sic] requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case.

[Tr. 24.]

Unlike the ALJ's credibility analysis, here the ALJ does appear to resort to boilerplate language to discount the opinions of two treating physicians at once. It is unclear to the Court how the ALJ arrived at the conclusion that these two treating physicians "apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant . . . ." *Id.* In a case such as this, with an extensive medical record and claims of both physical and mental impairments, the ALJ must do more than combine boilerplate language with a citation to the medical source statements. Each treating physician's opinion must be assessed individually, with reference to the factors listed in 20 C.F.R. § 404.1527(d).

16

For the reasons stated above, the Court remands the case to the ALJ for further analysis. In light of the decision to remand, the Court need not assess the RFC as it now stands.

## III.  Conclusion

Accordingly, it is hereby ORDERED that the decision of the Commissioner is AFFIRMED in part and REVERSED in part, and the case is REMANDED for further consideration, consistent with this Court's order.

<pre>
                                              s/ Nanette K. Laughrey
                                              NANETTE K. LAUGHREY
                                              United States District Judge

Dated:  May 9, 2011
Jefferson City, Missouri
</pre>